**STATE of Missouri, Plaintiff–Respondent,**

v.

**Dennis R. LUKER, Defendant–Appellant.**

**No. 18822.**

Missouri Court of Appeals, Southern District, Division Two.

March 31, 1994.

Rebecca Burke, Poplar Bluff, for defendant-appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Jennifer A. Glancy, Asst. Atty. Gen., Jefferson City, for plaintiff-respondent.

FLANIGAN, Judge.

A jury found defendant guilty of unlawful use of a weapon, § 571.030.1(1),[1] and he was

1. Except where otherwise indicated, all referen- ces to statutes are to RSMo 1986, V.A.M.S.

sentenced, as a persistent offender, to six years' imprisonment. Defendant appeals.

Defendant contends that the evidence is insufficient to support the verdict, and the trial court erred in ruling otherwise, because "the alleged dangerous weapon, the scratch awl, ... is a carpenter's tool and is used for legitimate purposes...."

■ Defendant's challenge to the sufficiency of the evidence requires this court to determine whether there was sufficient evidence from which a reasonable juror might have found him guilty beyond a reasonable doubt. *State v. Dulany,* 781 S.W.2d 52, 55[2, 3] (Mo.banc 1989). We accept as true all of the evidence favorable to the state, including all favorable inferences drawn from the evidence, and disregard all evidence and inferences to the contrary. *Id.*

Section 571.030 reads, in pertinent part: "1. A person commits the crime of unlawful use of weapons if he knowingly: (1) Carries concealed upon or about his person a knife, a firearm, a blackjack or any other weapon readily capable of lethal use; or ..."

In addition to its formal portions, the information charged that defendant, in violation of § 571.030.1(1), on October 17, 1992, in the city of Piedmont "knowingly carried concealed upon or about his person an awl, a weapon readily capable of lethal use."

The state's witnesses during its case-in-chief were: Anthony Littles, Carol Littles, Bill Atkins and James Gravley. Their testimony included the following:

Anthony Littles: I live at 307 Navaho, Piedmont. Defendant was my next door neighbor, and I was acquainted with him. He did small jobs for me. About 9 p.m. on October 17, 1992, he came to my door and wanted to borrow my car. I said, "No." He had been drinking. He got real angry and started arguing. He started to come at the door and I shut the door and locked it. He began banging and pounding on the glass door and yelling profanities at me. I reached for the phone, and he said that if I finished dialing I would have to answer to him. He made specific threats that he would kill me and that he would kill my wife and son when I was working. My wife and my two-year-old son were in my house. I completed my call to the police department and told Officer Atkins that I needed him at my residence and that I was having a problem with a neighbor. In three or four minutes Officer Atkins and Officer Gravley arrived. I was looking out the door window of my locked door. Defendant was standing just on the other side of the door with his front toward me. I was not able to observe the back portion of defendant.

Carol Littles: During the evening of October 17, I was in my bedroom and heard a commotion outside. Defendant was yelling. I heard my husband slam the door. I recognized defendant's voice. I heard him say he would hurt me and my husband. I did not see defendant before the police came. I never heard him threaten anybody with an awl.

Bill Atkins: I am a police officer for the city of Piedmont. Officer Gravley and I responded to a call for a disturbance at 307 Navaho. Defendant was being loud at the door. Mr. and Mrs. Littles were inside the house. We tried to get defendant to leave, but he became loud and hostile and cursed Officer Gravley and me. I told him if he didn't leave I would arrest him. Defendant stuck his arms out and said, "Arrest me." Defendant was arrested, hand-cuffed and taken to the police station. At the station, we started removing his property to inventory it. Defendant had on blue jeans. In his back pocket I found a scratch awl, state's Exhibit 1. I was not able to see any of it protruding from defendant's pocket. A scratch awl is used for sheet metal work. It is used for marking metal or cutting it. It's important that it has a point in its common everyday use. At no time prior to my finding the awl in his left rear pocket did defendant make any threats to use an awl or to use a weapon of any sort. The awl was in his pocket with the handle down, the point up. A scratch awl can be used as a weapon.

James Gravley: I am a police officer for the city of Piedmont. Officer Atkins and I responded to the call to the Littles' house. Defendant was very belligerent toward me and made derogatory statements. Defen-

dant was intoxicated. Officer Atkins tried to have defendant go on about his business, and asked him two or three times to go home or he was going to have to lock him up, and defendant said, "Go ahead, lock me up." Defendant was transported to the police department. Officer Atkins, pursuant to Piedmont Police Department policies, started a search of his person and found a scratch awl in defendant's left rear pocket of defendant's trousers. State's Exhibit 1 is the scratch awl. I never saw Exhibit 1 in defendant's back pocket. I could not see the awl when defendant was walking away from me. Defendant never threatened me with that awl or with the use of any weapon.

Defendant's mother, a defense witness, testified: My deceased husband was a carpenter who had a lot of tools. The garage door would not stay down if you didn't put something in the bottom of it to keep it down. [Defendant] was in and out of the garage quite a bit. [Defendant] used something to secure the door. It was a sharp instrument and Exhibit 1 looks similar to it. I cannot testify positively that Exhibit 1 was used to close the garage door.

Referring to § 571.030.1(1), our supreme court has said: "The essential elements of the offense are the knowing concealment and accessibility of a functional lethal weapon. A weapon is accessible if it is in such close proximity to the accused as to be within his easy reach and convenient control." *State v. Purlee*, 839 S.W.2d 584, 590 (Mo.banc 1992). "The test of concealment is whether a weapon is so carried as not to be discernible by ordinary observation." *Id.*

MAI–CR 3d 333.00 contains the following applicable definitions:

"Knowingly: A person . . . acts knowingly . . . (a) with respect to his conduct or to attendant circumstances when he is aware of the nature of his conduct or that those circumstances exist . . . "

"Readily capable of lethal use: [As used in Chapter 571] means readily capable of causing death."

Although § 571.030.1(1) refers to "a knife," not all knives are included in "knife." Section 571.010(9) reads: " 'Knife' means any dagger, dirk, stiletto, or bladed hand instrument that is readily capable of inflicting serious physical injury or death by cutting or stabbing a person. For purposes of this chapter, 'knife' does not include any ordinary pocket knife with no blade more than four inches in length."

■ The word "weapon," contained in § 571.030.1(1), is not defined. Since an awl is not among the weapons listed—a knife, a firearm, a blackjack—the inquiry is whether an awl is "a weapon readily capable of lethal use." It is not sufficient that it be "readily capable of lethal use." It must also be "a weapon." Webster's Third New International Dictionary defines "weapon" as "an instrument of offensive or defensive combat."

The state's brief says:

"The scratch awl [Exhibit 1] concealed in defendant's rear pocket was approximately 6½ inches in length, which consisted of a 3 inch handle and a 3½ inch 'blade' or 'metal, round shaft' with a sharp, pointed end. A scratch awl is used for marking, cutting, and piercing metal. Officer Atkins further testified that a scratch awl can also be used as a weapon and that he had investigated homicides where victims were killed by instruments similar to defendant's scratch awl."

Exhibit 1 is on file in this court. On its handle, which is of hard plastic, is the trade name "Craftsman" and "Scratch Awl." It is a manufactured tool which closely resembles a short ice pick.

■ For the reasons which follow, this court holds that the evidence is insufficient to support the verdict in that there was no proof that the scratch awl was a weapon, although it was readily capable of lethal use and it was carried concealed on defendant's person. The principal authorities leading to that conclusion are *State v. Baldwin*, 571 S.W.2d 236 (Mo.banc 1978), and *City of Independence v. Young*, 760 S.W.2d 909 (Mo.App. 1988). Although neither of those cases involved § 571.030.1(1), they enunciate dispositive principles.

In *Baldwin*, the prosecution was under § 564.610 RSMo 1969, now repealed. A submissible case was made under that statute

when the state's evidence, or reasonable inferences therefrom, showed "(a) the carrying of a dangerous or deadly weapon, (b) concealed on or about the person, (c) along with an intent to so conceal." *Baldwin*, at 240.

Defendant Baldwin was convicted of forcible rape and carrying a concealed weapon. When arrested, defendant had a steak knife concealed in his pants pocket. During the course of the rape, he told the victim that if she didn't submit he was going to hurt her.

In challenging the submissibility of the charge of carrying a concealed weapon, defendant conceded that the steak knife was found concealed in his pants pocket and that the evidence was sufficient to permit the jury to find that he intended to conceal the knife in his pocket. Submissibility was challenged on the ground that there was no evidence from which the jury could find that the knife was a dangerous and deadly weapon. The repealed statute listed certain weapons—any kind of firearms, a bowie knife, a springback knife—which were dangerous and deadly per se and required no jury finding to that effect.

At 241 the court said:

"The [1969] statute also makes punishable the concealed carrying of 'other similar deadly weapons.' When the weapon is not one specifically enumerated in the statute, the issue as to whether it is dangerous and deadly must be submitted to the jury unless the court can declare as a matter of law that under the evidence in the case the jury could not have concluded that the weapon was dangerous and deadly.

"It is obvious that there are many useful and practical items which are carried by persons for peaceful purposes. They are not normally thought of as dangerous and deadly weapons. Pocket knives, hammers, screwdrivers, wrenches, *cutting tools* and letter openers are examples of such articles. Other items such as butcher knives, steak knives, and *ice picks*, though not usually carried concealed on the person, are useful utensils utilized for peaceful purposes. *Such everyday instruments become dangerous or deadly only when they are used or carried for use as a weapon. The determination of whether in a particular case such instrument is dan-gerous and deadly would depend on a variety of factors—the nature of the instrument itself, the circumstances under which it is carried, including time, place, and situation in which defendant is found in possession, the manner in which it is carried, the particular person carrying it, and perhaps other factors such as possible peaceful uses therefor which the possessor might have.*" (Emphasis added.)

The court said, at 242:

"Applying the test articulated in these cases, we conclude that in view of all the circumstances shown in evidence, including the nature of the knife, where it was found on defendant's person, the time and place that defendant was carrying the concealed steak knife and what had occurred a short time earlier involving defendant and prosecutrix, the jury was justified in finding that the steak knife was a dangerous and deadly weapon."

In *Young*, defendant was found guilty of unlawful use of a weapon in violation of an ordinance of the City of Independence. The ordinance provided that a person commits the crime of unlawful use of a weapon if such person "carries a knife, nunchucks, firearm, blackjack, explosive weapon or any other weapon readily capable of lethal use." The ordinance did not require concealment.

The evidence showed that defendant wore a "throwing star" about his neck. The arresting officer testified that the throwing star is an item used in the martial arts. The circular star had eight arms extending from it with points on the end. The officer testified that the arms, which contained razor blades, would stick into a person if thrown.

The issue on appeal was whether the evidence was sufficient to prove that the throwing star was a weapon readily capable of lethal use. At 910–911 the court said:

"Applying the rationale of *Baldwin* to the facts in this case it is apparent that a 'throwing star' is not cited in the ordinance so it must fall within the category of '... any other weapon readily capable of lethal use....' Hence, the 'throwing star' is not a lethal weapon per se. Consequently, it becomes a question of fact whether or not the

'throwing star' is a lethal weapon under the test set out in *Baldwin*.

"The first factor involved is the nature of the instrument itself. For the purpose of this opinion it can be conceded that the 'star' was capable of inflicting serious physical harm and perhaps could even be used to inflict fatal injury. The evidence was far from satisfactory on this point but for the purpose of this opinion only that fact will be considered as established. The other factors set forth in *Baldwin* including the peaceful uses to which the possessor of the item may put it, lead to the conclusion that the 'throwing star' was not shown to be a lethal weapon under the circumstances of this case.

"It is admitted that the 'throwing star' was worn around Young's neck on a silver chain. Further, there is no evidence to indicate that Young had used the 'star' in any manner as a weapon at any time including the day on which he was arrested. Although the car in which he was riding was stopped in connection with suspicion surrounding an armed robbery, there was no evidence to indicate that Young or any of his companions were involved in an armed robbery. The only evidence is that Young was wearing the 'star' as an ornament around his neck at the time of his arrest and that Officer Storey had observed him wearing it in a similar fashion some weeks prior to his arrest.

"All of the factors which are to be considered in *Baldwin*, except the matter of the instrument itself, show that the 'throwing star' was not a lethal weapon as worn by Young at the time of his arrest. Young testified that he purchased the 'star' in Independence during the Santa–Cali–Gon days observance and that he had worn it as an item of personal jewelry for about seven years.

"Even conceding that the 'star' could be used in a lethal manner, the circumstances in this case show that the 'star' was not a lethal weapon while it was being utilized as an item of personal jewelry."

The court held that the evidence was insufficient to permit a finding that the star was a lethal weapon. The conviction was reversed.

Seeking to uphold the conviction, the state cites *State v. Dowdy*, 724 S.W.2d 250 (Mo. App.1986). The state says that the facts in *Dowdy* are "strikingly similar to the present case."

*Dowdy* is distinguishable. The instrument involved in *Dowdy* was a paring knife which met the definition of "knife" contained in the first sentence of § 571.010(9), and was not "an ordinary pocket knife" as used in the second sentence of that statute.

A scratch awl is not one of the weapons enumerated in § 571.030.1(1). To paraphrase *Baldwin*, a scratch awl is not normally thought of as a weapon readily capable of lethal use. It is an everyday instrument, and although it may be "readily capable of lethal use," it becomes so only if used or carried for use as a weapon.

As to the "variety of factors" listed in *Baldwin*:

The nature of the instrument itself is that it is a useful utensil which may be utilized for peaceable purposes.

The circumstances under which it was carried here were: Defendant, with the scratch awl concealed on his person, went to the home of his neighbor to borrow his car. The state's evidence showed that previously defendant had borrowed a shotgun and a motorcycle from Littles. There was no evidence that defendant's initial purpose in going to the Littles home was other than peaceable. The arguments and defendant's threats ensued after Littles had declined his request to borrow the car. At all times prior to defendant's arrival at the police station, the awl remained in his hip pocket. There was evidence that the awl was used to secure the garage door at defendant's home.

This court holds that the evidence was insufficient to support the verdict in that there was no showing that the awl was, under the circumstances here, a "weapon readily capable of lethal use." Whether defendant was guilty of other offenses for which he was not on trial is not an issue here.

The judgment is reversed and the defendant ordered discharged.

CROW and GARRISON, JJ., concur.